COHEN, WEISS AND SIMON LLP

COUNSELLORS AT LAW

330 WEST 42ND STREET

NEW YORK, N.Y. 10036-6976

———

(212) 563-4100

WRITER'S DIRECT INFORMATION:

PHONE: 212-356-0243
FAX: 646-473-8243
E-MAIL: ZLEEDS@CWSNY.COM

BRUCE H. SIMON
ROBERT S. SAVELSON
STEPHEN B. MOLDOF
MICHAEL E. ABRAM
KEITH E. SECULAR
PETER HERMAN
RICHARD M. SELTZER
JANI K. RACHELSON
BABETTE CECCOTTI*
SUSAN DAVIS*
MICHAEL L. WINSTON
THOMAS N. CIANTRA
JOSEPH J. VITALE*
PETER D. DECHIARA
LISA M. GOMEZ*
BRUCE S. LEVINE
TRAVIS M. MASTRODDI
DAVID R. HOCK*

SAMUEL J. COHEN (1908-1991)
HENRY WEISS (1910-2004)

RICHARD C. HARMON
SENIOR ATTORNEY

CLAIRE TUCK*
MARCELLE J. HENRY
EVAN HUDSON-PLUSH*
MICHAEL S. ADLER*
JOSHUA ELLISON*
ZACHARY N. LEEDS*
TZVI MACKSON
NOELIA E. HURTADO
DANYA AHMED*
KATE M. SWEARENGEN*

*  ALSO ADMITTED IN NJ

November 8, 2012

<u>By Electronic Case Filing and Regular Mail</u>

The Honorable Eric N. Vitaliano
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

> Re:   Nelson et al., v. Route Messenger Service, Inc. et al.,
>       11-CV-06358 (ENV)(SMG)

Dear Judge Vitaliano:

This firm represents Plaintiffs in this case.  On October 12, 2012, Plaintiffs filed an amended complaint, on consent of Defendants.  The amended complaint was filed under seal because it alleges certain facts based on documents produced by Defendants in this matter that Defendants marked as confidential pursuant to a confidentiality agreement between the parties. On an October 26, 2012 conference call with the Honorable Steven M. Gold, Defendants authorized Plaintiffs to file the amended complaint unsealed.  Enclosed is a copy of the amended complaint.

Thank you for your consideration.

Respectfully submitted,

/s/ Zachary N. Leeds

Enclosure (Amended Complaint)

cc:   Chief Magistrate Judge Steven M. Gold (by regular mail with enclosure)
      Keith McMurdy, Esq. (by ECF)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------- x
                                :

FELICIA E. NELSON and PETE MASTRANDREA :
as Trustees of the Local 804 Pension Fund,    :
                                :
                Plaintiffs,   :     11-CV-06358 (ENV)(SMG)
                                :
                vs.         :
                                :
ROUTE MESSENGER SERVICES, INC. d/b/a    :     **AMENDED COMPLAINT**
ROUTE MESSENGER SERVICE CORP,       :
MITCHELL KURTZER, COLUMBUS         :
MANAGEMENT SYSTEM, INC., SCHEDULED :
EXPRESS, INC., TRANSPORTATION         :
LOGISTICS CONSULTING, LLC, and MRK    :
ASSOCIATES INC.,                    :
                                :
                Defendants.   :
-------------------------------------------------------------- x

                    Plaintiffs Felicia E. Nelson and Pete Mastrandrea as Trustees ("Trustees") of the

Local 804 Pension Fund ("Pension Fund"), by their undersigned attorneys, Cohen, Weiss and

Simon LLP, for their amended complaint allege as follows:

## Introduction

        1.       This is an action by the Trustees as trustees and fiduciaries of the Pension

Fund, a multiemployer pension plan, for monetary and declaratory relief as follows:

                (a)      Pursuant to Sections 4201 through 4225 and 4301 of the Employee
Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§1381 through
1405 and 1451, the Trustees seek to collect withdrawal liability in the amount of $2,233,555,
incurred by defendant Route Messenger Services, Inc. d/b/a Route Messenger Service Corp
("Messenger") due to the Pension Fund for its withdrawal from the Pension Fund on or about
August 8, 2005 ("Withdrawal Liability"). The Trustees also bring this action against MRK
Associates Inc. ("MRK"), which is part of Messenger's controlled group under ERISA and the
Internal Revenue Code and is therefore also liable, jointly and severally with Messenger, for the
Withdrawal Liability.

                (b)      The Trustees also bring this action against an individual, Mitchell
Kurtzer ("Kurtzer"), to pierce the corporate veil and hold Kurtzer jointly and severally liable for
the Withdrawal Liability and for amounts awarded in a judgment obtained by the Trustees
against Messenger in the amount of $201,691.00 plus post-judgment interest ("Contributions
Judgment").

(c)    The Trustees also bring this action against Kurtzer, Transportation Logistics Consulting, LLC ("TLC"), Scheduled Express, Inc. ("Scheduled"), and Columbus Management Systems, Inc. ("Columbus") for relief pursuant to the New York Business Corporation Law ("BCL"), the New York Debtor and Creditor Law ("DCL"), and common law to restore assets necessary to pay the Withdrawal Liability and the Contributions Judgment.

## Jurisdiction and Venue

2.    The Court has jurisdiction over this action pursuant to 28 U.S.C. §1331, Section 301(a) of the LMRA, 29 U.S.C. §185(a), Sections 502(a)(3), 502(f), 515, and 4301(a), (b) and (c) of ERISA, 29 U.S.C. §§1132(a)(3), 1132(e)(1), 1132(f), 1132(g), 1145, and 1451(a), (b), and (c).

3.    Venue lies in this district under Section 502(e)(2) of ERISA, 29 U.S.C. §1132(e)(2), and Section 301(a) of the LMRA, 29 U.S.C. §185(a), as the Pension Fund maintains its principal office in this district.

## The Parties

4.    Plaintiffs are Trustees of the Pension Fund within the meaning of ERISA §3(21)(A), 29 U.S.C. §1002 (21)(A), and within the meaning of Section 502(a)(3) of ERISA, 29 U.S.C. §1132(a)(3).  The Trustees are the named fiduciaries of the Pension Fund and have discretionary control over the assets and administration of the Pension Fund.

5.    The Board of Trustees is comprised of labor and management representatives in accordance with Section 302(c)(5) of the Labor Management Relations Act of 1947 (the "LMRA"), 29 U.S.C. § 186(c)(5).  The Pension Fund is governed by a Restated Agreement and Declaration of Trust (the "Trust Agreement"), as amended from time to time. The Pension Fund maintains its principal place of business at 34-21 Review Avenue, Long Island City, New York 11101.

6.    The Pension Fund is a multiemployer pension plan within the meaning of Section 3(37) of ERISA, 29 U.S.C. § 1002(37), and an "employee pension benefit plan" within

- 2 -

the meaning of Section 3(2)(A) of ERISA, 29 U.S.C. § 1002(2)(A), that is subject to the withdrawal liability provisions of Title IV of ERISA.

7.     Pursuant to Sections 502(a)(3) and 4301(a)(1) of ERISA, 29 U.S.C. §§ 1132(a)(3) and 1451(a)(1), the Trustees are authorized to bring this action on behalf of the Pension Fund.

8.     Messenger is, and at all times relevant to this action has been, a New Jersey corporation registered to do business in New York, with its principal facilities located at one or more of the following addresses: 58-77 Maurice Avenue, Maspeth, NY 11378; 110 North Wood Avenue, Linden, NJ 07036; and 280 Broadway, New York, New York 10007.  Messenger is, and at all times relevant to this action, has been, an "employer" within the meaning of Section 3(5) of ERISA, 29 U.S.C. §1002(5), section 301 of the LMRA, 29 U.S.C. 152(2), and the Pension Funds' Trust Agreements.

9.     Messenger was formed in the 1950s by Edward Kurtzer ("E. Kurtzer").

10.     Kurtzer ran Messenger beginning in 1990 when he and his brother, Robert Kurtzer ("R. Kurtzer") purchased the company from their father, E. Kurtzer.

11.     Kurtzer was principally in charge of Messenger's day-to-day and financial operations.

12.     Kurtzer and R. Kurtzer purchased Messenger pursuant to an agreement with their father under which they agreed to pay him in monthly installments over about twenty years, totaling $1,237,967.52 plus interest.

13.     Through October 2005, Kurtzer and R. Kurtzer had paid E. Kurtzer regularly monthly installments towards the loan.

14.    E. Kurtzer had no professional involvement with Messenger from 1990 when he transferred ownership and control of the Messenger to Kurtzer and E. Kurtzer.

15.    Messenger ceased operations in August 2005.

16.    Messenger is, and at all times relevant to this action has been, solely owned in equal shares by Kurtzer and R. Kurtzer.

17.    Kurtzer resides at 222 E. 34th Street, Apartment 2118, New York, NY 10016.

18.    TLC is, and at all times relevant to this action has been, a New York corporation registered to do business in New York with its principal facilities located at one or more of the following: 350 Morgan Avenue, Brooklyn, NY 11211 and 250 E 40th Street, Apartment 6C, New York, New York 10016.

19.    TLC tax returns reflect that Ari Forman has a one percent ownership interest in TLC, but has no control over TLC and exercises no authority over TLC.  All ownership and other operational authority over TLC is, and at all times relevant to this action has been, exercised by Kurtzer.

20.    MRK has been a New York corporation with its principal facility located at 222 E. 34th Street, Apartment 2118, New York, NY 10016.

21.    MRK is, and at all times relevant to this action has been, solely owned in equal shares by Kurtzer and his R. Kurtzer.

22.    Columbus is, and at all times relevant to this action has been, a New York corporation registered to do business in New York with its principal facilities located at one or more of the following addresses: 350 Morgan Avenue, Brooklyn, NY 11211; 85 Hoffman Lane, Islandia, NY 11749; 8 Drake Avenue, New Rochelle, NY 10805.

23.     Columbus was formed in the 1950s and has been run since at least 1980 by brothers Vincent and Anthony Curcio brothers Anthony and Vincent Curcio ("A. Curcio" and "V. Curcio," respectively, together the "Curcios").

24.     Scheduled is, and at all times relevant to this action has been, a New York corporation registered to do business in New York with its principal facilities located at one or more of the following addresses: 350 Morgan Avenue, Brooklyn, NY 11211; 85 Hoffman Lane, Islandia, NY 11749; 8 Drake Avenue, New Rochelle, NY 10805.

25.     Scheduled was formed in 2005 by the Curcios.

26.     Both Scheduled and Columbus are, and at all times relevant to this action have been, solely owned in equal shares by the Curcios.

27.     The Curcios are in the process of dissolving Scheduled, or have already, dissolved Scheduled, and merging it into Columbus.

28.     Since January 2011, Scheduled has been operating under the Columbus name and the Curcios have been operating the two companies as one.

29.     As part of the merging process, Columbus and Scheduled will merge or already have merged all assets and liabilities.

30.     Columbus and Scheduled share facilities, employees, managers, officers, customers, outside service providers and vendors, and finances, and perform the same work, and have the same business purpose.

## Factual Basis For Claims

I.     **Damages**

      A.     **The Withdrawal Liability**

          31.     Messenger was bound to a series of collective bargaining agreements with Local 804, I.B.T. (the "Union"), including for the period January 1, 2003 through November 30, 2005 (the "CBA").

          32.     The Pension Fund is a third party beneficiary of the CBA.

          33.     The CBA and the Trust Agreement are plan documents within the meaning of Sections 502(a)(3) and 515 of ERISA, 29 U.S.C. §§1132(a)(3) and 1145.  In addition, the CBA is an agreement within the meaning of Section 301 of the LMRA, 29 U.S.C. § 185, between the Union, a labor organization representing employees in industries affecting commerce, and Messenger.

          34.     Upon information and belief, in or around August 2005 (other than any subsequent operations under different names), Messenger ceased its operations covered by the CBA and permanently ceased to have an obligation to contribute to the Pension Fund, thereby effecting a complete withdrawal from the Pension Fund within the meaning of Section 4203(a) of ERISA, 29 U.S.C. §1383(a) and the Trust Agreement.

          35.     As a result of Messenger's complete withdrawal from the Pension Fund, Messenger became liable to the Pension Fund for withdrawal liability in the amount of $2,233,555.00 ("Withdrawal Liability"), pursuant to Section 4201 of ERISA, 29 U.S.C. §1381, and the Trust Agreement.

          36.     By letter dated December 8, 2005, the Pension Fund notified Messenger ("Notice and Demand") of the amount of the Withdrawal Liability of $2,233,555.00, and of the schedule for withdrawal liability payments, and demanded the first payment by February 6,

2012.  The Notice and Demand was sent to Messenger at 280 Broadway, New York, New York 10007.  The Pension Fund demanded payment in accordance with the schedule, as required by Sections 4202 and 4219(b)(1) of ERISA, 29 U.S.C. §§1382 and 1399(b)(1), and the Trust Agreement.

37.     To date, Messenger has failed to make any payment toward the Withdrawal Liability.

38.     Pursuant to Article VII, Section 1(e)(II) of the Trust Agreement, "[a]n Employer is in default on its Withdrawal Liability payments if [*inter alia*] there is an assignment for the benefits of creditors with respect to the Employer . . . ."  Under Section 1(e)(III), "[i]n the case of a default on Withdrawal Liability, the Trustees may require immediate payment of the outstanding balance of the Employer's Liability, plus accrued interest on the total outstanding amount from the due date of the first payment which was not timely made."

39.     In or around October 2005, Messenger assigned its assets to a trustee for the benefits of creditors.  *In the Matter of the General Assignment for the Benefits of Creditors of Route Messenger Service, Inc*., Docket No. 0-3047, Superior Court of New Jersey Chancery Division: Probate Part, Union County ("Asset Assignment").

40.     As a result of the Asset Assignment, Messenger defaulted on its Withdrawal Liability.

41.     On or about January 4, 2006, the Trustees filed a proof of claim in the Asset Assignment for the full amount of the Withdrawal Liability.

42.     In addition, by this complaint, the Trustees demand payment of the full amount of the Withdrawal Liability.

B.      **The Contributions Judgment**

43.     On December 30, 2005, this Court granted a motion for summary judgment against Messenger, awarding $365,697.46 to the Pension Fund and an affiliated welfare fund. *Redmond, et al. v. Route Messenger Service, Inc*., 05-CV-02606 (CBA)(KAM) (Docket 21). The Court awarded the Pension Fund $201,691.11 (the "Contributions Judgment"), including delinquent contributions, interest, liquidated damages, and attorney's fees and costs.

44.     None of the $201,691.11 due to the Pension Fund under the Contributions Judgment has been paid.

II.     **Messenger's Shut Down and Dissipation of Assets**

A.      **Messenger's Imminent Shutdown**

45.     In the spring of 2005, Kurtzer concluded that Messenger would likely shut down within a few months.

46.     R. Kurtzer had no involvement with Messenger once it became clear it was going to shut down in the late spring of 2005.

47.     In Kurtzer's opinion, Messenger's shut down was due to the refusal of the Union and Messenger's employees to agree to certain collective bargaining agreement terms.

48.     After the collective bargaining agreement proposed by Messenger was rejected by Messenger employees in June 2005, Kurtzer began seeking to transfer Messenger's assets because he became aware that he was no longer going to be able to continue running and profiting from the business.

49.     Kurtzer's salary from Messenger, of at least $150,000 a year and in some years more, was never memorialized, and only decided orally by himself, R. Kurtzer, and their accountant.

**B.**   **Transfer of Messenger's Customer List and Goodwill For Kurtzer and Scheduled's Benefit, Without Compensation to Messenger**

50.   As he was shutting Messenger down, Kurtzer concluded that he could not sell the entire operating entity of Messenger as a whole because a purchaser would not want a business associated with the Union.

51.   At the time he was shutting Messenger down, Kurtzer contacted prospective purchasers who might be interested in obtaining Messenger's customers and goodwill.

52.   Kurtzer offered to sell Messenger's customer list ("Customer List"), and his relationship to the customers ("Goodwill"), to prospective purchasers.

53.   Kurtzer's relationship to Messenger's customers was developed solely in his capacity as a representative of Messenger.

54.   Kurtzer also offered to enter into a consulting and sales arrangement with the prospective purchaser, and then ultimately depart.

55.   Kurtzer sought to transfer the Customer List and Goodwill to a purchaser, at least in part, so that he could continue to earn an income related to Messenger's business.

56.   After contacting various prospective purchasers, Kurtzer ultimately reached an agreement with the Curcios, the two owners of another delivery operation, Columbus.

57.   The Curcios had heard in the spring 2005 that Messenger was in the process of shutting down.

58.   It was the Curcios' understanding that Messenger was shutting down for financial reasons, including due to its union obligations.

59.   The Curcios' contacted Kurtzer to confirm what they had heard, that Messenger was in the process of shutting down, which Kurtzer confirmed.

- 9 -

60. After speaking to Kurtzer about Messenger's imminent shut down, the Curcios later contacted Kurtzer again to discuss the possibility of the Curcios' business, Columbus, taking Messenger's place and serving its customers.

61. The Curcios ultimately decided that, because of the niche industries Messenger serviced, with clients with different client needs and expectations, their ongoing business, Columbus, could not service Messenger's customers.

62. Instead, the Curcios decided to form a separate business, Scheduled, to service Messenger's customers.

63. The Curcios reached an agreement with Kurtzer in late June 2005, pursuant to which he would transfer to them the Customer List and Goodwill and Kurtzer would be paid five percent commission on any Messenger customers Scheduled was able to obtain ("Customer Agreement").

64. At the time that the Curcios and Kurtzer entered into the Customer Agreement, they estimated that the approximate annual revenue that Scheduled would obtain from Messenger's transferred clients was $6 million.

65. The Customer Agreement has remained confidential, and Kurtzer has not informed anyone of its terms through the present, until it was produced in this lawsuit.

66. Scheduled began operating in August 2005.

67. Until at least November 2005, Kurtzer was busy shutting down Messenger and the task of obtaining Messenger's clients for Scheduled fell to Scheduled and its salepeople.

68. On their own, in the first six months of operations, through the end of 2005, Scheduled obtained about forty-five percent of Messenger's former accounts.

69.     Kurtzer was scheduled to begin receiving payments pursuant to the Customer Agreement in October 2005.

70.     Due to Scheduled's financial difficulties as it began operating, Kurtzer's first payment under the Customer Agreement was received in November 2005

71.     TLC, as Kurtzer's consulting company, has received some or all of the payments due from Scheduled, which it then pays to Kurtzer.

72.     No other entity or person received any compensation for the Customer List or Goodwill, or otherwise pursuant to the Customer Agreement.

73.     During its first year of operations, Scheduled lost some of Messenger's former accounts that it had obtained because Scheduled had trouble serving the niche industries that Messenger had served.

74.     Around November 2005, Kurtzer began working with Scheduled, to help maintain and increase its client base, and consult with Scheduled's business operations.

75.     By the time Kurtzer started working with Scheduled in November 2005, Scheduled had lost some Messenger clients, down to about thirty to thirty-five percent of Messenger's client base, and was able to help recover about ten percent of those clients.

76.     From the time Scheduled began operating through the present, every Scheduled customer was once a Messenger customer on the Customer List.

77.     From 2005 through 2009 Scheduled generated approximately $19,390,013.00 in revenue.

78.     The Curcios believe that the Customer list is Scheduled's most valuable asset.

C.    **Dissipation of Messenger Cash According to Kurtzer's Personal Ties and Interests**

79.    Kurtzer oversaw payments out of Messenger's accounts during its final months of operation.

80.    To the extent Kurtzer delegated any power to issue payments out of Messenger's accounts in its final months of operation, he had ultimate decision-making authority and oversaw such payments.

81.    As Messenger was shutting down and paying debts, Kurtzer decided who should be paid based on, as he testified under oath, "who has been good to you, and who has taken care of you, and who has been there for you."

82.    As Messenger was shutting down, Kurtzer directed Messenger to reimburse its attorneys for legal advice related to protecting Kurtzer and R. Kurtzer from personal liability, for protecting any other entity that might begin operations in Messenger's place from successor or alter ego liability, and for advice related to the Customer Agreement, none of which benefits Messegner.

83.    As Messenger was shutting down, Kurtzer permitted tens of thousands of dollars to be paid out for "petty cash," for which no receipts exist.

84.    As Messenger was shutting down, Kurtzer directed Messenger to continue to pay his father $10,862 a month through October 2005, ostensibly pursuant to his and his brother's purchase agreement.

85.    As Messenger was shutting down, Kurtzer permitted cash payments totaling tens of thousands of dollars to be paid to his brother R. Kurtzer Cash payments to Robert.

- 12 -

86.     Kurtzer does not know the grounds for the payments to his brother, but he testified under oath that the payments would not have been made without Kurtzer's knowledge.

87.     As Messenger was shutting down, through at least September 2005, Kurtzer directed Messenger to continue paying $771 a month to a business associate to obtain an ownership interest in a related entity, for his and R. Kurtzer's personal gain.

88.     As Messenger was shutting down, it transferred all of its remaining liquid and intangible assets to be distributed pursuant to the Asset Assignment, and transferred its tangible assets to be sold at a public auction.

89.     Kurtzer transferred $120,000 to the Asset Assignment trustee, along with any claims Messenger might have.  Proceeds from the Asset Assignment have not yet been distributed to creditors.

90.     The public auction generated over $200,000  in profit to Messenger.  All proceeds from the public auction were used to pay one creditor called Magnum Leasing, which had financed Messenger's vehicles.  Kurtzer decided to use the proceeds to pay this creditor because, as he testified under oath, he believed the owner(s) of that creditor "was an honorable guy, and I just assured them, because of the way that they had always conducted business with us, that they would be made whole."

91.     After Messenger transferred its remaining assets to the trustee overseeing the Asset Assignment, Kurtzer directed the trustee to reimburse Messenger's attorneys, who Kurtzer had used for his personal gain, before other creditors, because, as he testified under oath, "there were those that did good for us, and there are those who did bad by us; and [the attorneys] did good by us, and I wanted them paid."

## FIRST CAUSE OF ACTION
## Messenger's Withdrawal Liability

92.     Plaintiffs repeat and reallege the allegations set forth in the preceding

paragraphs.

93.     Section 4301(b) of ERISA provides that in an action to compel an

employer to pay withdrawal liability, the "employer's failure to make any withdrawal liability

payment within the time prescribed shall be treated in the same manner as a delinquent

contribution (within the meaning of section 515 [of ERISA] 29 U.S.C. §1451(b).)"

94.      Section 515 of ERISA, 29 U.S.C. §1145, requires "[e]very employer who

is obligated to make contributions to a multiemployer plan under the terms of the plan or under

the terms of a collectively bargained agreement . . . [to] make such contributions in accordance

with the terms and conditions of such plan or such agreement."

95.     Section 502(g)(2) of ERISA, 29 U.S.C. §1132(g)(2), mandates that:

> In any action brought by a fiduciary on behalf of a plan to enforce
> Section 515 in which a judgment in favor of the plan is awarded,
> the court shall award the plan,
> (a)     the unpaid contributions,
> (b)     interest on the unpaid contributions,
> (c)     an amount equal to the greater of
>    (i)      the interest on the unpaid contributions or;
>    (ii)     liquidated damages provided for under the plan in an
>      amount not in excess of 20 percent of the [unpaid
>      contributions],
> (d)     reasonable attorney's fees and costs of the action, and
> (e)     such other legal or equitable relief as the court deems appropriate.

96.     The applicable interest rate is set forth in the Pension Fund's Trust

Agreement or as set out in ERISA Section 502(g)(2), 29 U.S.C. §1132(g)(2).

97.     Messenger's failure to remit the accelerated lump sum payment

constitutes a failure to make withdrawal liability payments under ERISA Section 4301(b) and a

violation of Section 515 of ERISA, 29 U.S.C. §1145, thereby giving rise to an action pursuant to

Section 502(a)(3) of ERISA, 29 U.S.C. §1132(a)(3).

98.    The Trustees are entitled to a judgment against Messenger and MRK, a member of Messenger's controlled group, in the amount of $2,233,555.00, the accelerated lump sum amount of the Withdrawal Liability, plus interest at the rate set forth in the Trust Agreement, pursuant to ERISA Section 4219(c)(5), 29 U.S.C. §1399(c)(5), calculated from "the due date of the first payment which was not timely made," February 6, 2006, through the date the liability is paid, plus liquidated damages and attorneys' fees and costs pursuant to ERISA Sections 502(g)(2), and 4301(b), 29 U.S.C. §§1132(g)(2), and 1451(b), and the Trust Agreement.

## SECOND CAUSE OF ACTION
### Against Kurtzer for the Contributions Judgment and Withdrawal Liability

99.    Plaintiffs repeat and reallege the allegations of the preceding paragraphs as if fully set forth herein.

100.    Kurtzer should be personally liable, jointly and severally, for the Contributions Judgment and for the withdrawal liability because, *inter alia*, he was the controlling official of Messenger who dominated and controlled Messenger, because he disregarded the formality of Messenger as an entity with interests separate from his own, and because such actions caused harm to the Funds.

## THIRD CAUSE OF ACTION
### Against Kurtzer and TLC under the BCL

101.    Plaintiffs repeat and reallege the allegations of the preceding paragraphs as if fully set forth herein.

102.    BCL Section 510 (b) provides, in relevant part: "Dividends may be declared or paid and other distributions may be made out of surplus only, so that the net assets of the corporation remaining after such declaration, payment or distribution shall at least equal the amount of its stated capital."

103.    By causing Messenger's assets to be distributed to his family and for his

own benefit, Kurtzer violated BCL Section 510 (b) by preventing the Fund from collecting any

judgment that may be entered in this case and the Collections Judgment.

104.    BCL Section 719 (a) provides, in relevant part:

> Directors of a corporation who vote for or concur in any of the following corporate actions shall be jointly and severally liable to the corporation for the benefit of its creditors or shareholders, to the extent of any injury suffered by such persons, respectively, as a result of such action:

> (1) The declaration of any dividend or other distribution to the extent it is contrary to paragraphs (a) and (b) of section 510 (Dividends or other distributions in cash or property) …

> (3) The distribution of assets to shareholders after dissolution of the corporation without paying or adequately providing for all known liabilities of the corporation.

105.    BCL § 720 provides, in relevant part:

> (a) An action may be brought against one or more directors or officers of a corporation to procure a judgment for the following relief:

> (1) … to compel the defendant to account for his official conduct in the following cases:

> (A) The neglect of, or failure to perform, or other violation of his duties in the management and disposition of corporate assets committed to his charge.

> (B) The acquisition by himself, transfer to others, loss or waste of corporate assets due to any neglect of, or failure to perform, or other violation of his duties.

> (2) To set aside an unlawful conveyance, assignment or transfer of corporate assets, where the transferee knew of its unlawfulness.

106.    Kurtzer intentionally and unlawfully caused Messenger's corporate assets

to be distributed to his family and for his own benefit, creating its insolvency, thereby

intentionally violating their corporate duties in the management and disposition of corporate assets committed to their charge.

107.    Through the intentional distribution of Messenger's assets creating its insolvency, Kurtzer left Messenger unable to satisfy its debt to the Funds, thereby creating a cause of action for the Trustees under BCL § 720 to both compel Kurtzer to account for his conduct and to set aside the unlawful conveyances.

108.    To the extent that any amounts paid to Kurtzer or benefiting Kurtzer were paid to TLC as his consulting company, TLC is jointly and severally liable to the Fund for its gain under the BCL.

## FOURTH CAUSE OF ACTION
### Against Kurtzer, TLC, Scheduled, and Columbus under the DCL

109.    Plaintiffs repeat and reallege the allegations of the preceding paragraphs as if fully set forth herein.

110.    DLC §§273-276 provide as follows:

§ 273: "Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to actual intent if the conveyance is made or the obligation is incurred without fair consideration."

§273A: "Every conveyance made without fair consideration  when the person making it is a defendant in an action for money damages or a judgment in such an action has been docketed against him,  is fraudulent as to the plaintiff in that action without regard to the actual intent of the defendant if,  after  final judgment  for  the plaintiff, the defendant fails to satisfy the judgment."

§274: "Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent."

§275: "Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors."

§276: "Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay or defraud either present or future creditors, is fraudulent as to both present and future creditors."

111.   Kurtzer, by virtue of his distribution of Messenger's remaining assets without fair consideration, thereby rendering Messenger insolvent and unable to satisfy its debts to the Funds, is subject to an order obligating him to return sufficient assets to Messenger so that it can satisfy its financial obligations under any judgment entered in this action and the Contributions Judgment.

112.   Kurtzer, by virtue of his intentional distribution of Messenger's assets without fair consideration so as to render Messenger insolvent and incapable of satisfying its debts to the Fund, has caused Messenger to violate DCL § 276, and is thereby subject to an order obligating him to return sufficient assets with which Messenger can satisfy its financial obligations under any judgment entered in this action and the Contributions Judgment.

113.   To the extent that any amounts paid to Kurtzer were paid to TLC as his consulting company, TLC is subject to an order obligating it to return sufficient assets with which Messenger can satisfy its financial obligations under any judgment entered in this action and the Contributions Judgment.

114.   Scheduled, by virtue of its intentional receipt of Messenger's assets without paying Messenger any consideration so as to render Messenger insolvent or contribute to its insolvency is subject to an order obligating it to return sufficient assets with which Messenger

can satisfy its financial obligations under any judgment entered in this action and the Contributions Judgment.

115.    Columbus, because it is a single entity with Scheduled, is jointly and severally liable for any debt of Scheduled to the Fund.

## FIFTH CAUSE OF ACTION
### Against Kurtzer, TLC, Scheduled, and Columbus under the common law for conversion

116.    Plaintiffs repeat and reallege the allegations of the preceding paragraphs as if fully set forth herein.

117.    By virtue of Kurtzer's transfer of the Customer List and Goodwill, which was property of Messenger and to which Kurtzer did not have title, to Scheduled, without compensation to Messenger, causing damage to the Fund by rendering Messenger unable to pay its debts to the Fund, Kurtzer is subject to an order obligating him to return the converted assets and any revenue therefrom with which Messenger can satisfy its financial obligations under any judgment entered in this action and the Contributions Judgment.

118.    To the extent that any amounts paid to Kurtzer were paid to TLC as his consulting company, TLC is subject to an order obligating it to return the converted assets and any revenue therefrom with which Messenger can satisfy its financial obligations under any judgment entered in this action and the Contributions Judgment.

119.    By accepting the Customer List and Goodwill without any compensation to Messenger, which had right to its ownership of the Customer List and Goodwill, causing damage to the Fund, Scheduled is thereby subject to an order obligating it to return the converted assets and any revenue therefrom with which Messenger can satisfy its financial obligations under any judgment entered in this action and the Contributions Judgment.

120.    Columbus, because it is a single entity with Scheduled, is jointly and severally liable for any debt of Scheduled to the Fund.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court enter judgment against the defendants as follows:

A.    Declaring that Kurtzer individually dominated and controlled Messenger and disregarded the corporate formalities of Messenger as an entity with interests separate from his own; and

B.    Declaring that Scheduled and Columbus are a single entity and jointly and severally liable for each other debts; and

C.    Ordering Messenger and MRK to pay $2,233,555.00 to the Pension Fund in withdrawal liability, plus applicable interest and liquidated damages pursuant to Section 502(g)(2) of ERISA, 29 U.S.C. §1132(g)(2); and

D.    Ordering Kurtzer to pay the Trustees the Contributions Judgment and Withdrawal Liability plus applicable interest; and

E.    Compelling Kurtzer to account for his conduct in violation of the BCL or to pay damages to Messenger and the Trustees as its creditor, for unlawful conveyances under the BCL; and

F.    Ordering Kurtzer, TLC, Scheduled, and Columbus, under the DCL and common law, to pay to Messenger and the Trustees as its creditor damages for unlawfully obtaining and using Messenger's assets, so that Messenger can satisfy its financial obligations under any judgment entered in this action and the Contributions Judgment.

    G.  Ordering the defendants to pay the Trustees' reasonable attorney's fees and costs of this action under ERISA Section 502(g)(2) and/or DCL §276-A and/or or any other law or under equity; and

    H.  Ordering such other legal or equitable relief as the Court deems appropriate.

Dated: New York, New York
    October 12, 2012

         /s/ Zachary N. Leeds
         Jani K. Rachelson
         Bruce S. Levine
         Zachary N. Leeds
         COHEN, WEISS AND SIMON LLP
         330 West 42nd Street
         New York, NY 10036-6976
         212-563-4100
         jrachelson@cwsny.com
         blevine@cwsny.com
         zleeds@cwsny.com

         Attorneys for Plaintiffs